UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CAROLINE NELSON,

        Plaintiff,

v.

                                        Case No. 07-C-509

OSHKOSH TRUCK CORPORATION,

        Defendant.

**DECISION AND ORDER**

This case arises under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. Plaintiff Caroline Nelson claims that Defendant Oshkosh Truck Corporation n/k/a Oshkosh Corporation ("Oshkosh") violated the FMLA when it terminated her employment following a medical leave of absence. Presently before the Court is Oshkosh's motion for summary judgment. Oshkosh claims it is entitled to summary judgment because it terminated Nelson based on its "honest belief" that Nelson misrepresented the circumstances of her leave and did not use it for its intended purpose. For the reasons set forth below, Oshkosh's motion for summary judgment will be denied.

**I. Background**

Plaintiff Nelson began working for Defendant Oshkosh as a "107 prep and trim technician" in June, 2005. (Defendant's Proposed Findings of Fact ¶¶ 3-4.) Approximately three months later in September of 2005, Nelson was transferred to the position of "201 Assembler" where she worked

at a station on a moving assembly line assembling parts on truck frames during the hours of 6:00 a.m. to 2:30 p.m. (DPFOF ¶¶ 5-7.)

During the period of Nelson's employment, Oshkosh maintained written policies regarding family medical leave as well as "accident and sickness" benefits for represented employees. (DPFOF ¶¶ 9, 11.) While employed, Nelson requested FMLA leave on multiple occasions and also applied for accident and sickness benefits in July and December of 2006. (DPFOF ¶¶ 10, 14.).

Oshkosh also maintained policies governing employee conduct stating that a "serious behavior violation" such as "misrepresentation by an employee by representation or omission in Company records, health or injury history, pay, hours of work or production records" may result in termination of employment. (DPFOF ¶ 8.)

On the morning of December 11, 2006, the day that Nelson began the medical leave that is the subject of this lawsuit, Nelson called Oshkosh stating that she would not be coming to work because of a migraine. (DPFOF ¶¶ 15-16.) Later that day Nelson's physician, Dr. Kirsten Larson, completed a work restriction form releasing Nelson from work for three weeks. (DPFOF ¶ 19.) Following her doctor visit, Nelson informed Oshkosh of her need for extended leave. (DPFOF ¶ 20.) Harold Hanson, the Oshkosh claims manager who reviews FLMA requests, sent Nelson the paperwork required for FMLA leave and tentatively classified her leave as FMLA pending receipt of a completed healthcare provider certification form. (DPFOF ¶¶ 22-23.)

The following day, on December 12, 2006, Nelson personally went to Oshkosh's offices to reiterate her request for extended leave and to deliver a copy of the work restriction form that Dr. Larson had completed the previous day. (DPFOF ¶¶ 30-31.) Based on his observations of her, Hanson became suspicious of her claim that she was in need of medical leave. He noted that people

2

who were "really sick or really ill or really injured" do not physically come to the office to deliver a doctor's note. (Hansen Dep. 27: 7-13.) Instead, they would fax it in or have a family member deliver it. (Hansen Dep. 27: 13-15.) She appeared to be "dressed properly" and "going somewhere." He further noted that "people that do come in that are sick . . . don't appear like they're going somewhere." (Hansen Dep. 27: 19-20.) Based on Hanson's suspicions, Oshkosh decided to initiate surveillance of Nelson while she was on leave. (DPFOF ¶ 32.)

The company Oshkosh retained to perform the surveillance videotaped Nelson's activities on December 18 and 21, 2006. On December 18, she was observed for a period of several hours driving her car around town, shopping at various locations, and walking, standing, and sitting. On December 21, Nelson was observed running errands around town including grocery shopping, spending time at her child's daycare, changing a tail light on her car, and Christmas shopping. During the several hours she was under surveillance, she was seen operating her vehicle, standing, and carrying items. (Aff. of James Gardner ¶8, Ex. 1016.)

In the meantime, on December 20, 2006, approximately nine days after Nelson's meeting with Hansen, Oshkosh received from Dr. Larson the completed healthcare certification form. The form did not indicate a specific diagnosis other than "medical illness." (Gardner Aff. ¶8, Ex. 1009 at 1.) In a space provided for a listing of the "medical facts regarding the health condition," including treatment, Dr. Larson wrote "RX medications." (*Id.* at 2.) In another section seeking information concerning the employee's functional capacity, Dr. Larson checked a series of boxes indicating that during her leave, Nelson would be unable to perform employment functions such as standing, sitting, walking, moving her arms, lifting, and speaking. (*Id.*) In a space for "an

3

explanation of the extent to which the employee is unable to perform the functions of the position as a result of the health condition," Dr. Larson wrote "given off work." (*Id.* at 3.)

On January 2, 2007, Hanson reviewed the surveillance report and video showing some of Nelson's activities during her medical leave, and concluded that there were days during Nelson's leave that she "was able to work." (DPFOF ¶¶ 41, 45; Aff. of Hansen, ¶ 16.) Hanson contacted Oshkosh Human Resources Manager James Gardiner and provided him with copies of the surveillance report and DVD, and Nelson's FMLA paperwork. Based on this information, Oshkosh sought clarification from Nelson's medical provider. (DPFOF ¶ 47.)

On January 15, 2007, Oshkosh received a completed copy of the healthcare certification clarification form from Dr. Larson which indicated that Nelson's ability to stand, carry, sit, speak and other similar functions were "all . . . possible at times, but her ability to perform them was unpredictable–at home she could perform these activities only if she felt able." (DPFOF ¶¶ 50-51, 53; Hansen Aff., ¶ 21, Ex. 1018.) Dr. Larson wrote: "Ms. Nelson was unable to reliably perform her job duties due to her mental illness and side effects of her medication. Being home allowed her to work through the side effects and start her recovery without endangering her co-workers." (*Id.*)

Following receipt of the healthcare provider clarification form, Gardiner and Hanson met with Nelson on two occasions (January 25, 2007 and February 6, 2007) to question about her activities while on leave. (DPFOF ¶¶ 56-57, 60.) Nelson admitted to being the person in the video, but explained that "she could work when she did not have symptoms." (Nelson Dep. 73:16-20; DPFOF ¶ 58.) Dissatisfied with her response, Gardiner terminated Nelson's employment with Oshkosh on February 6, 2007, based on his determination that Nelson violated Oshkosh's behavior code by misrepresenting her medical status in her request for leave under the FMLA. (DPFOF

4

¶ 61-62; Gardiner Dep. 6:22-7:15, Mar. 11, 2008; Compl. ¶ 13.) Gardiner concluded that Nelson had been engaging in physical activities outside of her home (during her shift period) that were inconsistent with her claim that she was unable to perform the same activities while at work. (DPFOF ¶ 64-65, 67.)

Nelson commenced this litigation on May 31, 2007, asserting that Oshkosh interfered with her FMLA rights when it denied her request for family medical leave and terminated her employment. (Compl. ¶ 16-17.) Nelson contends in her brief opposing summary judgment that her leave request was a result of depression and anxiety and that she did nothing contrary to her doctor's instructions. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 1-2.) To support this contention, Nelson points to the clarification Oshkosh sought after she returned from her leave which indicated that she "could perform these activities only if she felt able." (Hansen Aff. ¶ 20, Ex. 1018; DPFOF ¶¶ 47, 53; Pl's Br. in Opp'n at 25.)

**II. Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

5

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion; however, there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

**III. Analysis**

The FMLA requires covered employers to provide up to twelve weeks of leave during any twelve-month period to employees who, because of a serious health condition, are unable to perform the functions of their position. 29 U.S.C. § 2612(a)(1)(D). The FMLA defines "serious health

6

condition" as an "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The leave may be taken all at once or intermittently. 29 U.S.C. § 2612(b).

An employer may require an employee seeking FMLA leave to submit a medical certification supporting the request. 29 C.F.R. § 825.305(a). A medical certification is sufficient under the FMLA if it contains the following information: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; (4) if the leave is for the employee's own serious health condition, a statement that the employee is unable to perform the functions of her job; and (5) for intermittent leave due to an employee's own serious health condition, a statement of the medical necessity of the intermittent leave, and the expected duration of the intermittent leave. 29 U.S.C. § 2613(b).

An employer may request subsequent recertifications of medical conditions under certain circumstances. For example, for chronic or permanent/long-term conditions under the continuing supervision of a health care provider, "an employer may request recertification no more often than every 30 days . . . , unless: (1) Circumstances described by the previous certification have changed significantly . . . ; or (2) The employer *receives information that casts doubt* upon the employee's stated reason for the absence." 29 C.F.R. § 825.308 (a) (emphasis added).

At the conclusion of an FMLA leave, an employee who took the leave "for the intended purpose of the leave" generally has a right to return to the same or equivalent position. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c). It is unlawful for an employer "to interfere with, restrain,

7

or deny the exercise of or the attempt to exercise" this right. 29 U.S.C. § 2615(a)(1). But an employee on FMLA leave is entitled to no greater right to continued employment than any other employee. Thus, just as any other employee who attempts to defraud his employer can be discharged, an FMLA employee who fraudulently obtains or misuses FMLA leave is subject to discharge and need not be reinstated. *Crouch v. Whirlpool,* 447 F.3d 984, 986 (7th Cir. 2006). Moreover, in order to defeat an FMLA interference claim, the employer "need not conclusively prove that [the employee] had misused her leave; an honest suspicion will do." *Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997). This follows from the rule that an employee seeking FMLA leave has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). If an honest suspicion of fraud or misconduct is a sufficient basis to discharge an employee not on FMLA leave, it is a sufficient basis to discharge one who is. *Id.* at 681; *see also Vail v. Raybestos Products Co.*, 533 F.3d 904, 909 (7th Cir. 2008) ("We have interpreted this to mean that an employer has not violated the FMLA if it refused to reinstate the employee based on an 'honest suspicion' that she was abusing her leave.").

Oshkosh argues that it is entitled to summary judgment because the undisputed evidence demonstrates that it had just such a suspicion regarding Nelson's conduct in this case. Oshkosh contends that its surveillance showed Nelson engaging in activities for extended periods of time that were inconsistent with her request for FMLA leave and the medical certifications submitted in support of her request. (Br. Supp. at 12.) Specifically, Oshkosh notes that the original medical certification it received on December 20, 2006, indicated that Nelson's condition manifested itself as a "medical illness," and that as a result of her condition, she was unable to walk short distances,

8

stand for more than 30 minutes, lift or speak. Despite these limitations, however, the surveillance showed her walking, standing, lifting and speaking while on leave without apparent difficulty. Even after receiving her physician's clarifying information, Oshkosh contends, it "still honestly believed that she was not using her leave for its intended purpose–to work through the side effects of her medical condition at home." (*Id.* at 13.) Unpersuaded by anything Nelson was able to say on her behalf, Oshkosh decided to terminate her. Because its decision was made in good faith, Oshkosh argues it did not violate the FMLA and Nelson's claim should be dismissed.

It may be true that a jury will ultimately conclude that the decision to terminate Nelson's employment was based on an honest suspicion that she was abusing her leave. But the evidence bearing on the issue is not so one-sided as to warrant summary judgment. "Even when an employer has proffered what appears to be a legitimate, nondiscriminatory explanation for its conduct, summary judgment will not be appropriate if the aggrieved employee produces evidence from which a jury reasonably could find that the stated explanation is false and that the real reason was discriminatory." *Duncan v. Fleetwood Motor Homes of Indiana, Inc.*, 518 F.3d 486, 491-92 (7th Cir. 2008). Nelson has done so here.

This is not to say that Oshkosh's initial decision to conduct surveillance and its request for clarification from Dr. Larson were unreasonable. The FMLA does not require an employer to ignore human nature and assume that each of its employees always tells the truth. Given the sudden manner in which the request for leave arose, the lack of specific information about the nature of the condition that required it, and Nelson's healthy appearance and behavior, Hanson's suspicions were understandable. And the fact that the surveillance report revealed that Nelson had engaged in activities while on leave that were inconsistent with the severe functional limitations set forth in Dr.

9

Larson's initial certification certainly justified further action on Oshkosh's part. If neither Nelson nor her physician had offered any explanation of the apparent inconsistency, Oshkosh's decision to terminate Nelson's employment would have been entirely justified.

But a further explanation was offered. Dr. Larson explained that Nelson was unable to reliably perform her job duties due to her mental illness and the side effects of a new medication she was taking. The side effects included nausea, unpredictable lightheadedness and worsening of her underlying anxiety. (Gardiner Aff., Ex. 1018.) Although the symptoms were expected to decrease as she adjusted to the new medication over the next several weeks, Dr. Larson indicated she had concluded that Nelson would not be able to work over the period for which leave was requested, even though she was able to attend to personal business. In sum, it appears from Dr. Larsen's clarification report that the activities documented in the surveillance report were not inconsistent with the limitations her doctor had placed upon her. From this a jury could conclude that Oshkosh's decision to terminate her employment was not based on an honest belief that she had abused her leave. A jury could conclude that Oshkosh simply saw an opportunity to get rid of an employee with a chronic mental illness whom it regarded as unreliable.

The cases cited by Oshkosh in support of its position are factually distinguishable. In *Kariotis*, the plaintiff had obtained FMLA leave from her position as an executive assistant for recovery from knee replacement surgery. Her employer became suspicious after several extensions of her initial ten-week leave and ordered surveillance. Private investigators videotaped the plaintiff on three separate occasions, on each of which she was observed walking, driving, sitting, bending, and shopping (pushing a grocery cart) without apparent difficulty. 131 F.3d 674-75. Similarly, in *Crouch*, the plaintiff was videotaped doing 48 minutes of yard work while supposedly on FMLA

for a knee injury. 447 F.3d at 985. In both cases, the basis of the employer's belief that the employee had misrepresented his or her condition was apparent. The activities in which the plaintiff employees were observed engaging were obviously inconsistent with the physical limitations that accompany replacement of, or injury to, a knee. Given the evidence, the conclusion that the employees in those cases had misrepresented their condition would have been difficult to avoid. Here, by contrast, Nelson's mental illness, as described by her doctor in her clarifying report, rendered her ability to function at all uncertain and unreliable, at least until she adjusted to her medication. Her doctor therefore recommended that she be on leave for the brief period of time this was expected to take. In light of this evidence, Oshkosh's claim that it acted out of an honest belief is not dispositive.

The more recent case of *Vail v. Raybestos Products Co.* is also distinguishable on its facts. In that case the employee was granted intermittent FMLA for a chronic problem with migraine headaches. Although her condition did not necessarily result in the same kind of physical limitations as knee surgery, the employer nevertheless concluded that she was abusing her leave when surveillance revealed she was using it to work at her husband's lawn care business mowing lawns. The Court found the evidence sufficient to establish an honest suspicion on the part of the employer:

> Vail had taken medical leave for her October 6, 2005 evening shift. The next morning, the off-duty police officer saw Vail working for her husband's lawn-mowing business. Raybestos received this information after it already suspected that Vail was gaming her leave in order to work for her husband's business. So when it heard information consistent with what they suspected she was doing while on leave, Raybestos decided to terminate her. Vail's call later that day-after a day of mowing under Sergeant Largent's gaze-stoked this suspicion. As a result of this "honest suspicion," Raybestos did not violate Vail's rights under the FMLA.

11

533 F.3d at 910. Driving around town on personal errands for a few hours is significantly different that mowing lawns for a family business. Here, there is far less to suggest that Nelson did not take her leave for its intended purpose. Summary judgment will therefore be denied.

**IV. Conclusion**

I conclude that a genuine issue of material fact exists as to whether Oshkosh had an honest belief that Nelson had abused her leave under the FMLA. Its motion for summary judgment is therefore **DENIED**. Defendant's motion to file a supplemental brief is also **DENIED**. The Clerk is directed to set this matter on the Court's calendar for further scheduling.

**SO ORDERED** this ___23rd___ day of September, 2008.

                                              s/ William C. Griesbach
                                              William C. Griesbach
                                              United States District Judge